UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REBECCA L. BORGER, | : | CIVIL NO: 1:22-CV-01097 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, *Acting* | : | |
| *Commissioner of Social Security*, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OPINION

## I.  Introduction.

This is a social security action brought under 42 U.S.C. § 405(g).  Plaintiff Rebecca L. Borger seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income under Title XVI of the Social Security Act.  We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set forth below, we will vacate the Commissioner's decision and remand the case to the Commissioner for further proceedings.

## II.  Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 13-1* to

*13-7*.[1]  On November 30, 2018, Borger filed an application for supplemental

security income alleging that she became disabled on February 7, 2017. *Admin. Tr.*

at 410–14.  She listed her conditions as: (1) long-term Lyme disease;

(2) bartonella; (3) babesiosis; (4) ehrlichiosis; (5) gastroparesis; (6) joint

hypermobility; and (7) migraines. *Id*. at 425.  After the Commissioner denied her

claim at the initial level of administrative review, Borger requested an

administrative hearing. *Id.* at 138–45.  And on October 3, 2019, Borger, who was

represented by counsel, testified at a hearing before Administrative Law Judge

("ALJ") Jarrod Tranguch. *Id*. at 41–69.  By a decision dated January 15, 2020, the

ALJ determined that Borger was not disabled since November 30, 2018, the date

her application was filed. *Id*. at 122, 128.  More specifically, the ALJ found at step

2 of the five-step process that Borger did not a severe impairment. *Id*. at 125–28.

And so, he denied Borger benefits. *Id*. at129.  The Appeals Council subsequently

vacated the ALJ's decision, and it remanded the case to the ALJ with instructions

to, among other things, "[o]btain evidence from a medical expert related to the

---

[1]  Because the facts of this case are well known to the parties, we do not
repeat them here in detail.  Instead, we recite only those facts that bear on Borger's
claims.

nature and severity of and functional limitations resulting from the claimant's impairments." *Id*. at 133–37 (citation omitted).

On remand, the ALJ served medical interrogatories on a medical expert, Dr. James Washburn, M.D. *Id*. at 1056, 1066.  After reviewing Borger's medical records, Dr. Washburn completed the interrogatories as well as a Medical Statement of Ability to do Work-Related Activities (Physical). *Id*. at 1056–75.  Dr. Washburn also testified at a telephonic hearing before the ALJ on August 3, 2021. *Id*. at 70–107.  Borger and a vocational expert testified at that hearing as well. *Id*.

By a decision dated October 12, 2021, the ALJ again determined that Borger was not disabled since November 30, 2018, the date her application was filed. *Id*. at 11, 23.  This time, the ALJ proceeded through all steps of the five-step analysis. *Id*. at 10–23.  Borger appealed this decision to the Appeals Council, which denied her request for review. *Id*. at 2–6.  This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In July 2022, Borger, represented by counsel, began this action by filing a complaint claiming that the Commissioner's decision is not supported by substantial evidence and is contrary to law. *See Doc. 1*.  She requests that the court reverse and set aside the Commissioner's decision and grant such further relief as is justified, including the award of attorney's fees. *Id*. at 5–61(Wherefore Clause).

3

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 12*. The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 12, 13*. The parties filed briefs, *see docs. 14–15*, and this matter is ripe for decision.

## III.  Legal Standards.

### A.  Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*,

4

48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Borger is disabled, but whether substantial evidence supports the Commissioner's finding that she is not disabled and whether the Commissioner correctly applied the relevant law.

### B.  Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.

To receive benefits under Title XVI of the Social Security Act, a claimant generally must demonstrate an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).  Unlike with disability insurance benefits under Title II of the Social Security Act, "[i]nsured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits" under Title XVI of the Social Security Act. *Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar. 22, 2017).  Supplemental Security Income "is a federal income supplement program funded by general tax revenues (not social security taxes)" "designed to help aged, blind or other disabled individuals who have little or no income." *Id*.

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 416.920.  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 416.920(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is '"that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 416.945(a)(1).  In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).  But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which

evidence he has rejected and which he is relying on as the basis for his finding."
*Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The
"ALJ may not reject pertinent or probative evidence without explanation." *Johnson
v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the
reviewing court cannot tell if significant probative evidence was not credited or
simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.

On October 12, 2021, the ALJ denied Borger's claim for benefits. *Admin.
Tr.* at 10–29.  At step one of the sequential-evaluation process, the ALJ found that
Borger had not engaged in substantial gainful activity since the date of her
application for benefits. *Id.* at 12.

At step two of the sequential-evaluation process, the ALJ found that Borger
had the following severe, medically determinable impairments: "fibromyalgia,
joint hypermobility/functional neurological symptom disorder, and hallux valgus
deformity of feet." *Id*.  He also determined that although Borger had eczema,
GERD, headaches/migraines, and gastroparesis, those impairments were not
severe. *Id*. at 12–13.  He further determined that Borger's hip pain and elevated
antinuclear anti-body level were not medically determinable impairments. *Id*. at

8

13–14.  Similarly, the ALJ determined that Lyme disease was not a medically

determinable impairment in this case:

> Specifically in this matter, the claimant alleged long-term Lyme
> disease and bartonella and babesiosis, as secondary infections
> with Lyme disease.  In terms of the Lyme disease, the
> diagnostic testing has been generally negative.  The claimant
> does treat with Dr. Mast, who did testing and found evidence of
> "past Lyme disease" and coinfections.  Dr. Mast's handwritten
> records are mostly indecipherable, but he has prescribed the
> claimant a wheelchair, a shower chair and multiple medications.
> However, the bloodwork done to test for Lyme disease, at best,
> is indeterminate, but really is with negative findings. . . . As
> such, despite the claimant receiving treatment related to this
> condition, it is not documented with acceptable laboratory
> diagnostic techniques.  Further, recent rheumatology records
> note that the claimant was not sure any of the medication
> prescribed has made a difference in her symptoms.

*Id*. at 13–14.[2]

At step three of the sequential-evaluation process, the ALJ found that Borger

did not have an impairment or combination of impairments that met or medically

equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at

14–15.

The ALJ then determined that Borger has the RFC to perform a limited

range of light work. *Id*. at 15.  He determined that she "could lift and carry twenty

pounds occasionally and ten pounds frequently with sitting up to eight hours in a

workday in four-hour increments, standing three hours in a workday in two-hour

---

[2] For readability purposes, here—and elsewhere—when citing or quoting the
ALJ's decision, we omitted the ALJ's citations to the record.

increments and walking three hours in a workday in two-hour increments." *Id*.  He

also determined that she could frequently "climb, balance, stoop, kneel, crouch and

crawl." *Id*.  And she "can tolerate frequent exposure to unprotected heights,

moving mechanical parts, operation of motor vehicle[s], humidity/wetness, dust,

odors, fumes, pulmonary irritants, extreme cold/heat and vibrations and can

tolerate a loud noise level, such as heavy traffic." *Id*.

In making this RFC assessment, the ALJ reviewed Borger' assertions, noting

that she claims that she is disabled "due to long-term Lyme disease, bartonella,

babesiosis, gastroparesis, joint hypermobility and migraines." *Id*. at 16.  The ALJ

also noted that Borger contends that she is "unable to walk without assistance or

short distances with a cane," that "she loses balance and is unable to sit upright for

extended periods due to leg numbness," that "her hands are unreliable and pain

affects her ability to hold items," that "her pain affects her ability to concentrate

and she has stomach pain, vomiting and nausea, and an elevated heart rate that

causes dizziness and extreme fatigue." *Id*.

The ALJ also reviewed Borger's testimony at the two hearings.  He observed

that at the original hearing, Borger testified that "she developed leg pain and

weakness," and that she "appeared in a wheelchair and said she felt she needed it

due to problems walking and was eventually given a prescription for it." *Id*.  He

further observed that Borger testified that "she needs to elevate her legs during the

day," that "she gets pain in the knuckles and joints in her hands," that she has "brain fog from her conditions and fatigue and nausea from medication," that "she has problems digesting that causes vomiting at time," that she has "shortness of breath and lightheadedness related to heart problems," that she has "migraines that occur once or twice a month to at least every other month or so, and they can last two to three hours." *Id*. And she "testified that she is limited to spending time in bed reading, watching television and movies and playing video games if her hands are not hurting." *Id*.

And the ALJ summarized Borger's testimony from the second hearing by noting that she "testified she continue to use a wheelchair outside the home due to bilateral pain and weakness and uses a cane to walk in the home," that "she is able to walk independently without an assistive device, but she would be slow and off balance," that "she has used these devices since 2017," that "her mother continues to help her with bathing and personal care," that "she is unable to do chores or leave the home alone," that "she tries to elevate her legs throughout the day," that "she has intermittent pain in her hands at the knuckles that causes loss of grip strength," that "her pain causes her to be tired and have problems thinking," and that "she has bad days once a week." *Id*.

Although the ALJ found that Borger's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" and that

Borger's testimony "was candid and supports some limitations," her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent the medical evidence[.]" *Id.* at 16, 20.

And after considering Borger's treatment records and the testimony of Dr. James Washburn, a medical expert who answered interrogatories and testified at that second hearing, *id.* at 16–20, the ALJ found that the objective medical evidence supported the limitations he had set forth:

> In sum, a longitudinal review of the medical evidence in this matter shows that the claimant is treating with a physician that she relates is a specialist in Lyme disease, although the objective records from this provider do not indicate this. These records are not completely legible aside from some areas with check-off findings. This is the only provider finding significant objective deficits and prescribing assistive devices such as a cane and wheelchair. However, there is no objective diagnostic or clinical findings to support that these devices are medically necessary for ambulation, and the undersigned cannot provide a limitation for the same in the residual functional capacity. As discussed in detail above, even the Lyme testing is negative or indeterminate, while the MRI, EMG and laboratory workups do not result in a specific finding. Further, Dr. Washburn reviewed the medical evidence and concluded the claimant did not need an assistive device for ambulation. As such, the undersigned considered some degree of gait abnormality, hypermobility of joints and the claimant's foot deformity in lowering the exertional level to light with specific limitations to time allowed for standing, walking and sitting, and providing postural limitations. However, the normal diagnostic testing and generally consistent findings of full muscle strength, normal reflexes and intact gait would not support a further reduction in exertion or more restrictive postural limitations. The undersigned also provided an array of environmental limitations to prevent any exacerbations of symptoms and to

prevent injury in the workplace.  However, the objective
medical evidence in this matter does not support a greater
degree of limitation than provided above.

*Id*. at 20.

And in addition to considering that opinion testimony of Dr. Washburn, as

noted above, the ALJ also considered the other opinion evidence in the record. *Id*.

at 21–22.  He found the opinion of Dr. Mast not persuasive:

> As for the opinion evidence of record, an opinion from Dr.
> Mast that the claimant is wheelchair bound for walking greater
> than 50 feet and unable to sit or use hands more than 30
> minutes was not persuasive because it is not well supported by
> any diagnostic or laboratory findings as discussed above, as the
> MRI, EMG and Lyme disease testing did not show a significant
> abnormality or definitive Lyme disease finding.  Further, the
> opinion is inconsistent with the majority of objective clinical
> findings discussed above of full muscle strength, normal
> reflexes and no sensory abnormalities in the lower extremities.
> The records also show the claimant's gait as slightly antalgic
> with grossly intact range of motion of the hips, ankles and
> knees.  Further, more recent examination findings from a
> rheumatologist are also inconsistent with this opinion as the
> claimant is found to have full muscle strength, normal reflexes
> and intact sensation documented on multiple examination,
> including neurological examination findings of a negative
> Romberg's test for balance deficit.  As such, this opinion was
> not persuasive.

*Id*. at 21.  The ALJ found the opinion of Dr. Smith, a state agency medical

consultant who found Borger limited to a range of light work, partially persuasive.

*Id*.  And he found that opinion of Dr. Anzalone, a state agency mental consultation

who in February 2019, found Borger did not have a medically determinable

psychological impairment, persuasive. *Id*.

At step four of the sequential-evaluation process, the ALJ found that Borger had no past relevant work. *Id*. at 22.

At step five of the sequential-evaluation process, considering Borger's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as ticket seller, information clerk, and price marker—that exist in significant numbers in the national economy that Borger could perform. *Id*.

In sum, the ALJ concluded that Borger was not disabled. *Id*. at 23.  Thus, he denied her claim for benefits. *Id*.

## V.  Discussion.

Borger's brief does not comply with the local rules of court, which require that the plaintiff's brief in a social security action include, among other things, a statement of errors setting "forth in separate numbered paragraphs the specific errors committed at the administrative level which entitle plaintiff to relief[,]" and an argument that is "divided into sections separately addressing each issue" and that "set[s] forth the contentions of plaintiff with respect to each issue and the reasons therefor." M.D. Pa. L.R. 83.40.4(b), 83.40.4(c).  Borger's failure to comply with the rules makes it difficult to isolate her claims.  Nevertheless, the Commissioner does not object that Borger's brief does not comply with the rules,

and the Commissioner reasonably construes Borger's brief as raising two primary claims: (1) whether substantial evidence supports the ALJ's evaluation of Borger's subjective complaints; and (2) whether the ALJ erred in failing to order a consultative neuropsychiatric evaluation. *See doc. 15* at 2–3. We address the second of these claims first, and we conclude that the ALJ abused his discretion by failing to develop the record as to Borger's functional neurological symptom disorder.

"Although the Supreme Court has described [Social Security Administration] administrative proceedings as 'adjudicative,' they are not classically so because they are 'non-adversarial,' and at times 'inquisitorial.'" *Anderson v. Comm'r of Soc. Sec.*, No. 21-2009, 2022 WL 1635628, at *2 (3d Cir. May 24, 2022) (footnotes omitted). "[T]he special nature of proceedings for disability benefits dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence." *Dobrowolsky v. Califano*, 606 F.2d 403, 406–07 (3d Cir. 1979) (footnote omitted). The ALJ must play an "active role" in this regard. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). He or she has "a duty to develop a full and fair record[,]" and "must secure relevant information regarding a claimant's entitlement to social security benefits." *Id*. When the claimant is unrepresented, the ALJ must "assume a more active role[.]" *Dobrowolsky*, 606 F.2d at 407. Nevertheless, the duty to develop a full and

fair record "applies regardless of whether a claimant is pro se or represented because of the non-adversarial nature of Social Security disability benefit proceedings." *West v. Kijakazi*, No. 3:21-CV-01350, 2023 WL 2742746, at *4 (M.D. Pa. Mar. 31, 2023) (citing *Boone v. Barnhart*, 353 F.3d 203, 208 n.11 (3d Cir. 2003)).  And "[i]n all cases," "[t]he ALJ has a duty to develop the record when there is a suggestion of mental impairment by inquiring into the present status of [the] impairment and its possible effects on the claimant's ability to work." *Plummer v. Apfel*, 186 F.3d 422, 434 (3d Cir. 1999).

"One of the tools available to an ALJ in this setting is a consultative examination." *Kenyon v. Kijakazi*, No. 1:22-CV-1457, 2023 WL 5617791, at *10 (M.D. Pa. Aug. 30, 2023).  "[T]he ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." *Thompson v. Halter*, 45 F. App'x 146, 149 (3d Cir. 2002).  But a consultative examination may be required "where the medical evidence in the record is inconclusive[.]" *Kenyon*, 2023 WL 5617791 at 10 (internal citation and quotation marks omitted).

Dr. Washburn opined as to the need for a neuropsychiatric evaluation, and because the ALJ relied heavily on the opinions of Dr. Washburn, we set forth Dr. Washburn's opinions in some detail.  As noted above, Dr. Washburn responded in

writing to interrogatories from the ALJ. *Admin. Tr.* At 1056–75.[3]  The

interrogatories directed to Dr. Washburn were titled "MEDICAL

INTERROGATORY PHYSICAL IMPAIRMENT(S)—ADULTS." *Id*. at 1067.  In

response to those interrogatories, Dr. Washburn asserts that he had not personally

examined Borger, that there was sufficient objective evidence to allow him to form

an opinion about the nature and severity of Borger's impairments, and he listed

several impairments including, as relevant here, functional neurological disorder.

*Id*.  In this latter regard, he wrote:

> 2)  Functional Neurological Disorder — Clmt c/o weakness,
> numbness lower extremities.  No objective basis identified.  All
> studies were normal.  Lyme Disease antibodies were neg.  ANA
> was posit[ive] but alone does not indicate autoimmune disorder.
> Gait described as astasia abasia — nonpathological conversion
> disorder.  Rec. Psychiatric Evaluation (1F, 2F).

*Id*.  Dr. Washburn also opined that Borger's impairments did not meet or equal a

listing, but he noted that he did not consider psychiatric listings. *Id*. at 1068 ("No

applicable listing, physical[.]  Psychiatric listings may apply but not evaluated.").

---

[3] There are two sets of interrogatory responses from Dr. Washburn.  With one exception, they appear to be identical. *Compare Admin. Tr.* at 1056–65 with *Admin. Tr.* at 1066–75.  That one exception concerns Dr. Washburn's handwritten notation about Borger's need to use a cane or a wheelchair.  On one response, Dr. Washburn wrote: "Claimant using cane and wheelchair.  There is on objective evidence to support this." *Id*. at 1061.  On the other, he wrote: "Claimant is using cane and wheelchair, per file.  There is <u>no</u> objective evidence to support this use of an assistive device." *Id*. (underlining in original).  It appears that the second response was a correction of the first response, and so we cite to the second response.

Dr. Washburn attached to his interrogatory responses, a "MEDICAL STATEMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL)." *Id*. at 1070–75.  In this statement, he set forth Borger's ability to lift and carry, to sit, stand, and walk, to use her hands and feet, as well as her ability to engage in various postural activities, her ability to tolerate environmental conditions, and her ability to engage in various activities. *Id*. at 1070–75.  Dr. Washburn also opined that Borger did not require the use of a cane to ambulate, and as noted above, he wrote:  "Claimant is using cane and wheelchair, per file. There is <u>no</u> objective evidence to support this use of an assistive device." *Id*. at 1071 (underlining in original).

Dr. Washburn also testified at the second hearing.  He testified that he retired as a full-time clinical physician and associate professor, and that he is now associated with Mednick & Associates. *Id*. at 75–77.  He acts as a medical expert for social security cases, averaging about 500 reviews a year, in 90% of which he testifies. *Id*. at 77–78.  Dr. Washburn testified that he is board certified in internal medicine, but that he has "no certification in neurology or any kind of neurological area." *Id*. at 75, 79.  He testified that there is sufficient evidence in the record for him to have an opinion as to Borger's medical status, and he confirmed that he reviewed the additional medical evidence that was added to the record after he responded to the ALJ's interrogatories and that that evidence would not cause him

18

to change his responses to the interrogatories or to change his medical source statement. *Id*. at 79–81.

Dr. Washburn testified that Borger's complaints were consistent throughout her treatment records, and the records documented that she was using a cane or wheelchair. *Id*. at 82–83.  But he also testified that most of her tests were normal, and although Dr. Mast prescribed a wheelchair, there "was never a reason identified for why if was necessary." *Id*. at 83.  And when asked if there were times when a doctor cannot make a specific diagnosis or cannot figure things out, he testified:

> A  Well, certainly there's cases like that, but particularly [given] the age of this Claimant I would certainly exhaust all possibilities trying to find answers for this.  And one -- when there is a diagnosis -- a preliminary diagnosis of a functional neurological disorder, which is a psychiatric disorder, I did not see any significant psychiatric evaluations in the file.  So, I don't think all --
> Q  Is that something that you --
> A  --avenues were exhausted.
> Q  Is that something that you think should be -- would be recommended in terms of fully understanding or fully getting to the issue of what's causing her --
> A  I think it --
> Q  -- impairment?
> A  I think it would be very important.  And I think it was even mentioned as a possibility in the Johns Hopkins notes.  And to be thorough, I certainly think a good neuropsychiatric exam would be very helpful to the Claimant.
> Q  And would that assist -- would that be able to assist you in offering further opinions as to whether or not she would meet or equal any listings in terms of Social Security Disability?

A  Well, I don't know that it would help me, but I think a psychiatric expert would be better.  If there were findings on that exam, then a psychiatric expert would be better to handle those listings than would I.  I am certainly not --

Q  Well, let me --

A  --an expert --

Q  Let me rephrase --

A  -- in that field.

ATTY:  Let me rephrase that a little bit.  Would it help the person deciding the claim --

ALJ:  Counsel, I don't know that you could -- I don't know that you could ask him --

ATTY:  Well --

ALJ:  -- that question, whether he can opine as to whether additional evidence would help me decide the claim or not.

ATTY:  So are you objecting to my question, Your Honor.

ALJ:  Well, no, I'm not objecting to your question, but I'm just trying to figure out what you're -- you're basically asking the Doctor whether a psychiatric evaluation would help me decide the claim.  I'm just not sure that the doctor can answer that.

BY ADMINISTRATIVE LAW JUDGE:

Q  Doctor, if you can answer that, go ahead.

A  I can't specifically answer that it would help you with the complaint.  But I think for completeness sake, it may be very helpful in explaining the Claimant's symptomatology and therefore would be helpful to whoever made those decisions.  I think it would definitely be of benefit.

*Id*. at 83–85.

Following Dr. Washburn's testimony at the second hearing, the ALJ asked

Borger if she had had a psychological evaluation as suggested by Dr. Washburn.

*Id*. at 98–99.  She testified that her previous primary-care doctor had recommended

that she go to a therapist, that she went for a couple of sessions, but the therapist

20

told her that she did not have "clinical depression or anxiety or anything like that."

*Id*. at 99.  But in response to the ALJ's follow-up question about whether she had

"a comprehensive psychological evaluation," she confirmed that she had not. *Id*.

In his opinion, the ALJ did not squarely address Dr. Washburn's

recommendation for a neuropsychiatric exam to help the decision maker

understand Borger's symptoms.  Instead, that ALJ only briefly addressed Dr.

Washburn's testimony in this regard, stating:

> Dr. Washburn testified the claimant may need to explore
> psychiatric reasons for the cause of her symptoms.  However,
> the undersigned notes that the claimant had not pursued any
> mental health treatment on her own and has not alleged any
> mental health impairments.

*Id*. at 19.  At the outset, we note that, contrary to the ALJ's description of his

testimony, Dr. Washburn did not merely testify that Borger may need to explore

psychiatric reasons for her symptoms.  Rather, Dr. Washburn recommended a

neuropsychiatric exam to help the decision maker understand Borger's symptoms.

Further, although whether Borger pursued mental health treatment may be a

valid basis to evaluate her symptoms, *see* 20 C.F.R. § 416.929(c)(3), "[g]enerally,

an ALJ must not 'find an individual's symptoms inconsistent with the evidence in

the record on [the basis of non-compliance with treatment] without considering

possible reasons he or she may not comply with treatment or seek treatment

consistent with the degree of his or her complaints." *Anderson v. Kijakazi*, No.

21

3:20-CV-02452, 2022 WL 635539, at *6 (M.D. Pa. Jan. 18, 2022) (quoting *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P at * 9 (S.S.A. Oct. 25, 2017) ("SSR 16-3p"), *report and recommendation adopted*, 2022 WL 626777, at *1 (M.D. Pa. Mar. 3, 2022). "Valid alternative reasons for not seeking treatment can include when a claimant's mental impairments prevent him or her from understanding 'the appropriate treatment for or the need for consistent treatment of his or her impairment,' when a claimant cannot afford treatment, or when a claimant is not 'aware that he or she has a disorder that requires treatment.'" *Id*. (quoting SSR 16-3p at * 10).  But the ALJ did address whether there were any valid reasons that Borger had not sought mental health treatment.

And while it is true that Borger did not allege a psychological or psychiatric impairment in her application for benefits, *id*. at 425, the ALJ acknowledges that she was diagnosed with functional neurological symptom disorder. *Id*. at 17. Moreover, at Step Two, the ALJ found that Borger's functional neurological symptom disorder was a medically determinable severe impairment. *Id*. at 12. Thus, Borger's mental health was squarely before the ALJ.

Further, Dr. Washburn's responses to the interrogatories, his medical source statement, and his testimony all suggest that his responses were about Borger's physical condition, not her mental condition.  Yet, the ALJ failed to acknowledge

this.  And the ALJ failed to address Dr. Washburn's testimony that functional

neurological symptom disorder is a psychiatric condition,[4] and a neuropsychiatric

exam would benefit the factfinder.  This, even though Borger's counsel requested a

neuropsychological examination. *See Admin. Tr.* at 406 (August 9, 2021 letter to

the ALJ from Borger's counsel submitting additional records and requesting that, if

the ALJ feels that the evidence provided does not warrant an award, the ALJ

---

[4] *See also* American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, §2—Somatic Symptom and Related Disorders (5th ed. 2013) ("Somatic symptom disorder and other disorders with prominent somatic symptoms constitute a new category in DSM-5 called *somatic symptom and related disorders.* This chapter includes the diagnoses of somatic symptom disorder, illness anxiety disorder, conversion disorder (functional neurological symptom disorder), psychological factors affecting other medical conditions, factitious disorder, other specified somatic symptom and related disorder, and unspecified somatic symptom and related disorder. All of the disorders in this chapter share a common feature: the prominence of somatic symptoms associated with significant distress and impairment.").  It appears that the ALJ may have failed to appreciate that functional neurological symptom disorder is a mental impairment.  For example, the state agency mental consultant concluded that Borger did not have any medically determinable mental impairment. *Admin. Tr.* at 112.  The ALJ found that consultant's opinion persuasive, but he failed to explain how he squared finding that opinion of no mental impairment persuasive with his earlier conclusion that one of Borger's severe, medically determinable impairments was functional neurological symptom disorder.  Further, at Step 3 of his analysis, the ALJ also failed to mention any mental listings even though one of those listings is Listing 12.07 (Somatic symptom and related disorders). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §12.07.  Moreover, without explanation, at certain places in his opinion, the ALJ refers to Borger's functional neurological symptom disorder in conjunction with joint hypermobility. *See Admin. Tr.* at 12 (finding that Borger had severe impairments including "joint hypermobility/functional neurological symptom disorder"), at 15 (observing that Borger's medical problems include "joint hypermobility/functional neurological symptom disorder).  This odd expression of Borger's conditions may reflect the ALJ's failure to appreciate the psychiatric aspect of functional neurological symptom disorder.

"schedule the Claimant for a neuropsychological examination as Dr. Washburn's testimony suggested would be necessary to fully and completely assess Ms. Borger's condition").

Given the above circumstances, the ALJ abused his discretion by failing to develop the record regarding Borger's functional neurological symptom disorder, and thus remand is warranted. *See Orozco v. Comm'r of Soc. Sec.*, No. 2:21-CV-321-TLN-KJN, 2022 WL 1645815, at *4 (E.D. Cal. May 24, 2022) (recommending remand to the ALJ for further development of the record as to mental impairments, including functional neurological disorder, which "appears to contain both physical and psychological components"), *report and recommendation adopted*, 2022 WL 2757639, at *1 (E.D. Cal. July 14, 2022); *Susan H. v. Kijakazi*, No. 4:20-CV-00030-TMB, 2021 WL 5326410, at *5 (D. Alaska Nov. 16, 2021) (concluding that "[g]iven the physical and psychological aspects of a functional neurological symptom disorder diagnosis," evidence of an official diagnosis of functional neurological disorder presented for the first time to the Appeals Council, had "a reasonable probability of changing the outcome of [the] case" and warranted remand so that that diagnosis can be "considered by a medical expert and evaluated by the ALJ" and concluding that the ALJ's rejection of the claimant's testimony regarding her symptoms as not supported by the objective medical evidence also warranted remand given that "with a conversion

24

disorder," such functional neurological disorder, "the victim actually and subjectively experiences symptoms without a known or clinically verifiable medical cause"). Thus, we will vacate the decision of the Commissioner and remand the case to the Commissioner for further development of the record.

We briefly explain here why remand is the proper remedy, rather than an award of benefits, as Borger requests in her complaint. *See doc. 1* at 5 (Wherefore Clause) (requesting that the court reverse the Commissioner's decision and award her benefits).

Under sentence four of 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Thus, although a remand is often the appropriate remedy, the court may also enter an order awarding the claimant benefits. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 358 (3d Cir. 2008) (remanding the case to the district court with directions to enter an order awarding the payment of benefits); *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (same); *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984) (same). But an "award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*,

745 F.2d at 221–22.  Whether there has been excessive delay and/or prior remands also bears on whether to award benefits or to remand for further proceedings. *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 391 (M.D. Pa. 2019).  "Thus, in practice any decision to award benefits in lieu of ordering a remand for further agency consideration entails the weighing of two factors: First, whether there has been an excessive delay in the litigation of the claim which is not attributable to the claimant; and second, whether the administrative record of the case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id*.

Here, although there was some delay in this case given that the Appeals Council remanded the case to the ALJ for further proceedings, we cannot say that there has not been excessive delay in the litigation of Borger's claim.  Nor can we say that substantial evidence on the record as a whole shows that Borger was disabled during the relevant time and entitled to benefits.  Thus, we will remand the case to the Commissioner for further proceedings.

Because we conclude that remand is warranted based on this claim, we do not reach Borger's other arguments.[5]

---

[5] "Plaintiff's additional claims of error may be remedied through the case's treatment on remand." *Brown v. Saul*, No. CV 3:18-1619, 2020 WL 6731732, at *7 (M.D. Pa. Oct. 23, 2020), *report and recommendation adopted*, 2020 WL 6729164, at *1 (M.D. Pa. Nov. 16, 2020).  "A remand may produce different results on these claims, making discussion of them moot." *Id*.  Although we do not

## VI.  Conclusion.

For the foregoing reasons, we will vacate the decision of the Commissioner

and remand the case to the Commissioner for further proceedings pursuant to

sentence four of 42 U.S.C. § 405(g).  An appropriate order follows.


_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge

---

address and resolve Borger's other arguments, we do note that the ALJ's
credibility determination is puzzling.  The ALJ characterized Borger's testimony as
candid. *See* Oxford English Dictionary online (defining candid as "[f]rank, open,
ingenuous, straight-forward, sincere in what one says").  Nevertheless, he appears
to wholesale reject her testimony, which painted a picture of a woman who could
barely walk and who even needed assistance from her mother to bathe.  And again,
it appears that in making his credibility determination, the ALJ failed to appreciate
the psychiatric aspect of Borger's functional neurological symptom disorder.  And
with conversion disorders, the credibility question may turn on whether the
claimant was feigning her symptoms. *See Weidman v. Colvin*, 164 F. Supp. 3d 650,
696 (M.D. Pa. 2015) ("The credibility question in this case turns on evidence of
Plaintiff's volition: Plaintiff's assertions that she has no control over the physical
and psychological symptoms (which could be explained by a somatoform
diagnosis) versus medical evidence indicating voluntarily feigning and
symptoms.").